Council, if you would approach. This would be Mr. Watts. And if you'd like to begin. This morning, Your Honor, by the way, I joined last time I was here four years ago in this case. Mr. Brandon Munk was introduced to the court. He was not a member of this bar at the time. He's now a member of this bar. We're also accompanied Mr. Munk and I today by Mr. Michael Williams, who's not a member of this bar, but hopefully soon will be. The case started out about 10 years ago on November the 9th, 2011. Laura Covington was arrested by DPS Trooper Clary. Lawsuit was filed in 2013. The district judge, Melinda Harmon, in February of 2017, granted a 12b6 to the city. And in that 12b6, she found that the police chiefs were policymakers. And then she found other things that that were appealed. The policymaker finding was not appealed by the city. And it came up to this court and was argued here on or about November the 7th, 2019. This court issued its opinion on May the 15th, 2020. During the hearing, Judge Inglehart asked if there were five police officers. And I didn't hear him at first. I'm wearing the the sheet here this morning and I appreciate them. But I said eventually that there were eight. And that's that's the amount number of police officers that were in Madisonville at all times. The second thing that stands out that Judge Inglehart asked of opposing counsel for the city was did the the chief know or did the supervisors know that there was going to that there was a plan afoot by Mr. Covington, Sergeant Covington, the second-in-command in the police department, to plant drugs or try to enlist confidential informants to plant drugs on his ex-wife's car in order to regain or to cut his cost on child support. And at that time the city said said no twice. The city said no, no supervisor knew. Well what we know is that in fact Chief May knew at least three times from police officers. He knew from Officer Lorenz, L-A-W-R-E-N-Z. He knew twice from CIMS, Corporal CIMS, who was a technical sergeant or who was technically in control, not a sergeant, but technically in control of the police department. And CIMS even presented to Chief May a tape recording that he had garnered from from the police department's own files, recordings, that reproduced or had preserved a conversation between Sergeant Jeff Covington and a confidential informant Toby Smith. In that conversation, which you have before you in the briefing, the plan was laid out for Toby Smith. Smith of course later on testified that or through Ranger De La Garza admitted that he had used the drugs given to him by Sergeant Covington, spent the money, and didn't do the didn't do the plant job as he had been hired. So we have a couple of points to start off with. Is policymaker the issue that this court sent the matter back to the district court on? I suddenly yesterday in rereading this for the  the district court, after listening to argument, concluded that policymaker had not been appealed and that as had been observed in a different format of a case, in the Brown case, that in an case. And so I wondered why in the world did this matter when the court, very specifically I thought, directed the district court to two issues. The district court said that this court directed him to two issues. And so when it went back, the district court took it up. There were no new facts in a verification affidavit by a former chief, Claude Bay, which seemingly contradicted his deposition testimony that what he said was policy. And it was on the basis of that verification that was supplied in in this case before Judge Haynen that the Judge Haynen granted in effect the summary judgment. No facts changed except the facts that were presented by Claude Bay. And the the facts that he presented in that verification contradicted what he had said in his deposition testimony five years before. We refer to that in the reply brief as a sham affidavit. And I think that it bears pointing out to the court that the record seems to support that maybe extravagant comment, specifically in the policy book which we presented to the court. If you look at the record of appeal, 3494, it says that the policy book drafted by Jeffrey Covington and presented to the city council by Claude Bay is entitled in section three, the management. If you go to the next page, you see in on page 3495 that on Roman numeral seven, that policy book, which was never never criticized, never commented on, it was simply presented and adopted by the city council. It says in chain of command, the following chain of command has been established for all employees to adhere to. City manager, oh he's there, chief of police, sergeant, officer, reserve officer. That's in paragraph A. Paragraph B says the chain of command will follow the department's organizational structure as outlined in this manual. This ensures each person is responsible to only one supervisor. Now if I look at the manual and I see what the organizational structure is, that's at page 3590, 3508, and I see that Covington and May, in doing the organizational structure that was adopted by the city council, nowhere mentions a city manager, nowhere mentions a city council, and the police department starts off at the top with the chief of police. If I then look over to the forward of the manual at 3496, the forward says at the top first paragraph, it is intended to serve the purpose of governance and guidance of the department. This manual contains those guidelines that are permanent, unchanging, and always binding upon officers of the department. Now if I go to the last two line sentence, it says the right to modify or rescind any of the provisions of this policy manual is reserved to the chief of police and it's signed by C.W. Chuck May, chief of police. Let me ask you, I understand what you've set forth already. It seems to me that we're talking about possibly, you tell me where I'm in error, seems like we're talking about the legal responsibility as a policy maker under Texas law, whether it comes from a home rule charter or some other type of municipal creation, there's a legal policy maker role and then there is a de facto policy maker, which is I believe what you're talking about here with Covington and the people that were actually in the police department. As I understand your argument, you're saying, well, the city said, well, you all figure out the policies and then they came back with this manual and the city said, okay, great, let's vote on it, and he opposed, okay, it's adopted. But what is the legal difference between the two for purposes of liability? I'm going to tell you, I did not pick you up clearly on the hearing assistance. Okay, what I'm asking is what is the legal difference for purposes of your claim between the legal responsibility as a policy maker under law, under Texas law, versus a policy maker in fact, which it sounds like you're arguing these police officers and police department were? Well, I think I understood the question. So my understanding is that Texas law, first of all, follows the Supreme Court, that there is no presumption that a municipality will have one policy maker in one form or another. Number two, Texas law, like in Zarno, has allowed, found, and held that police chiefs are policy makers. Now, in this particular case, in a situation that arose in Oklahoma, which I cited yesterday in a 28-J, in a case that arose in Oklahoma but was tried in Texas, we had an opinion by Judge Jolly for the panel, which said, and I started thinking about it, because the district judge in this case, and this may be a little longer than you expect, but the district judge in this case sort of, he referred to Claude May as a decision maker, not a policy maker. Well, but if you look at what we have, we have a single incident. Actually, we have a single target. We have a single target with three different incidents. Three different times Claude May was not to investigate. But so what we have Judge Jolly saying is that a decision maker's adoption in Brown of a course of action tailored to a particular situation and not intended to control decisions in later situations may give rise to municipal liability under 1983. Now, in this case, it's a fact question. It's a fact question as to what perhaps they intended. But we don't have any delimiting comment at any time by the city manager. We don't have any delimiting comment at any time for the city council. And we're told in the manual that they passed, that was distributed by Chief May and approved by city council, that this is the forever and ever fundamental governance of the police department and can only be changed by him. We now know that is probably the basis for the opinions that are offered by both Clinton and when he was chief, he says he could throw the whole darn manual out if he wanted to. And or what May said, what I say is policy. Is there a case, Fifth Circuit or Supreme Court case that stands for the proposition that the policymaker for purposes of liability in this claim, this type of claim, is determined based upon the totality of the facts and circumstances of the individual case? The duty is in policies in the eye, policy makers in the eye of the beholder. Well, it's based upon all the circumstances, regardless of what the manual says, regardless of what somebody in a city council meeting says, the policymaker is the person who makes the policy based on all the facts. Is there a case that would support that proposition? If you look at what May said in his newfound memory, his new factual verification, he never says that he wasn't the policymaker. He just simply says he was cognizant that the city manager was his boss. Well, but he doesn't say in which aspect. We know that the city manager and the city council determined what fiscal issues were going to be handled or regulated in the department. Okay. Thank you, Mr. Watts. But it's a fact question, I admit. Okay. All right. You've saved time for rebuttal. We'll hear from Mr. Helfand now. I hope I didn't over-talk the matter. No, that's fine. Good morning, and may it please the Court, Bill Helfand for the City of Madisonville, Texas. Let me start if I may. Sir, can you turn that by answering Judge Engelhardt's questions, and I'll take the second one first because I think it informs the answer to the first one. There is a case that addresses this question. It's Perprotnick versus the City of St. Louis versus Perprotnick. As the Court may recall, in City of St. Louis versus Perprotnick, Mr. Perprotnick made the very same argument that appellant is making here. That is, the authority regarding, in that case, hiring and firing lies not with the Civil Service Commission where the law placed it, but rather with the Chief, the individual who made the decision. And that the, like the City Council is analogized here, in that case, the City Council of the City of, I'm sorry, the Civil Service Commission of the City of St. Louis was analogized to a rubber stamp. And as we speak about the policy manual, for example, that's really the appellant's argument. As the Chief wrote it, that should come as no surprise. In this particular case, he's the most knowledgeable law enforcement officer in the city, but it's subject to City Council approval and enactment. But the answer to the other question that Your Honor asked is, this is not a factual question at all, and this Court has made that clear. In Grodin versus the City of Dallas, cited at page 17 of the appellee's brief, the Court made this issue clear and, again, consistent with the Supreme Court's holding in Proprotnick. That is, this is a question of law, and that is the way the District Judge treated this question. It's specifically, as the Grodin Court explained, and Proprotnick is, of course, guided, is a question of state law. And so, as a legal question, I take issue with my friend who says, perhaps there's a fact question here. The answer to this question is found in Texas state statute, and that's exactly where the District Judge pointed in addressing this issue. He did not, as counsel suggested, rely upon Chief May's affidavit or declaration, although Chief May's declaration and his deposition testimony made clear that, in fact, Chief May and Chief Clenenden before him were subject to council regulation and the oversight of the City Manager. The answer to this question is found in local government code section 25.029 and section 341.001A, both of which provide that a general law city in Texas, and Madisonville is a general law, not a home rule city, so there is no charter, may, and that the City Council may provide for and govern a police department. That is the statute that creates the ability of the city to, I'm sorry, enacts the ability of the city to create a police department. Now, the city then passes ordinances, and at record 287 and 88, 2222 and 2224, the city ordinances that the city enacted in order to provide for the police department create the authority of the police department and place that under the supervision of the City Manager. So, the district court resolved this question of law with reference to state law and city ordinance, and because the city does not affirmatively delegate this authority to somebody else, it remains with the City Council as a matter of law, and that's consistent with this court's en banc opinion in Bennett v. Slidell, in which the court observed that that authority, quote, is usually a council or commission that will be the governing body to which responsibility may be attached. Now, to be sure, the appellant points to cases in which city charters have actually delegated that authority elsewhere, and that is the province of a home rule city, because a city charter, as the court knows, is adopted by the citizens of the city, but this is not a home rule city, and so the only legal authority upon which the district court could rely, and this court must rely, is the local government code and the city ordinances. Now, just to be sure, the police department manual, council paraphrases some of the police department manual, but in the manual page at record 21-12, the manual expressly states, quote, the police department is governed by the city of Madisonville and the city manager, and the record shows that the city council actually exercised that policymaking authority by requiring Chief May to submit the proposed departmental policy changes and his departmental personnel policies to council for consideration and approval, and those are at record 17-30, 20-42 through 50, 20-60 through 20-63, and 20-92, which are actual council ordinances adopting those proposed changes, and in fact, the district court found wrong the same argument that Appellate's making here. There, Appellate made the same argument that the city met to review and possibly approve Chief May's overhaul of the policy manual, and that this was somehow an indication that, a la Proprotnick, the city council was simply voting to rubber stamp, but the district judge specifically held the city, this is a quote from Judge Hannon, the city did not acknowledge the police chief as having the final say on police policies. His actions had to have council approval. That's at record 38-80, and in fact, the district judge pointed out that the evidence strongly demonstrated the contrary of the argument that Appellant is making here, so as a matter of law, that's the end of the inquiry. It's certainly where the district judge resolved the question and granted summary judgment. I do want to point out, because I was in a hurry, I didn't want to forget Judge Englehart's questions and try to answer them, I take issue with my friend's assertion that Judge Harmon, in granting a 12B6 motion to dismiss the city, made a judicial finding that is binding on this case, that is, as presented at the outset of Appellant's argument, that the chief of police is the city's policymaker. Judge Harmon made no such finding. What Judge Harmon found was, even if, as alleged, the chief were the city's policymaker, the plaintiffs failed to state a claim upon which relief could be granted under the narrow basis for governmental summary judgment, nor can I find it in any of the Appellant's briefing. That's a new theory, not one that was raised before, but again, it is not the law of this case that the chief is the policymaker of the city. That issue was not decided as a matter of Now, to move even further afield, what actually is in the Appellant's briefing is only a more watered-down version of what the Appellant argued originally, which is, again, to answer Judge Englehart's question, the city council is, according to the Appellant, a rubber stamp. The court should regard the facts of the manner in which the police department was and that was the argument to the trial court before. That's not the argument now, as the court would observe. The Appellant has now refined that into a more in-fact policymaking argument, which is that the chief of police had control over the confidential informant role and that, in that particular, according to the Appellant, policymaking role, it somehow caused the deprivation of which the Appellant complains, and so while the district court didn't reach those questions because the trial judge correctly found that the policymaker is, by statute and by city ordinance, the city council, this court can obviously affirm the summary judgment on any grounds and should affirm, even if it were to entertain contrary to the law, the argument that the chief was not the policymaker. So let me ask you, too. Last time you all were here, the court reversed in part based on the possibility of there being, this all relates to the policymaking or the Monell claim, being a single incident failure to supervise claim and a ratification claim. To what extent was that briefed in the district court and did we go straight to the policymaking issue? Yes, sir. Well, those were briefed in the district court. Again, the district judge didn't reach those questions after finding consistent with the law that the chief was not the policymaker, but let me speak to those because, again, of course, they're grounds to affirm the district court's summary judgment. There is simply no evidence in the record that the allegation, and that's all it is, of the failure to supervise Covington's use of a confidential informant somehow caused Covington, that is, was the moving force to cause Covington to commit a criminal act. And in fact, the evidence, and Your Honor is certainly quite familiar with it, having now heard about this twice, it actually demonstrates the very contrary. The appellant's complaint is Covington was able to utilize his role as a police officer to commit a criminal act, and the fact of his criminal act is certainly undisputed. Your Honor may recall, the last time I was here, I said, that's not under color of state law. Obviously, the court disagreed, but it is definitely not caused by a lack of supervision of the relationship between confidential informant and police officer, because what caused by in 1983 parlance, for purposes of governmental liability, is that there must be a, there must be proof that it was the moving force, that it was the execution of the policymaker's policy which caused the violation itself. The analogy I give law enforcement officers often is, if the chief says, strip search everyone on the side of the road, and an officer stops someone and says, I know this is unconstitutional, but the chief says, I've got to do it, that's a policy, it comes from a policymaker, that by its operation is the moving force behind a constitutional violation. Here, and this is where, and this court certainly observes regularly, the failure to train, failure to supervise claims break down, because except in the absence of a clear need for training, this court has held that's too amorphous to find that causal link, and of course, that's consistent with this court's opinion in Piotrowski versus City of Houston, and also Bennett versus City of Slidell, and McKee versus the City of Rockwell, all of which are cited at brief page 33, isolated unconstitutional actions by municipal employees will almost never trigger governmental liability, and to his credit, my friend on behalf of the appellant acknowledges this is the very isolated incident that makes that point. This court has generally and repeatedly rejected single incident liability under section 1983. Sanchez versus Young County, cited at page 33 of the brief. In fact, to date, this court has confined single incident exceptions to training cases where, as the court explained recently in Henderson versus Harris County, that the governmental entity provided no training at all, and so if the court were even insufficient supervision of the confidential informant caused Sergeant Covington to co-opt that confidential informant to commit a crime, it still fails because the evidence, the undisputed evidence in the record shows, and I'll find that record site for the court, that both chiefs it's in the record, 1729 for Chief May and 4275 for Chief Clenenden, that they had input and supervision over Covington's use and handling of confidential informants. It's also undisputed in the record at 1725 and 1856 that the local district attorney participated in the selection and oversight of the use of confidential informants, so if the court thought, and I'm not a sponsor of this, but just to be careful, if the court thought that it was appropriate to extend the potential for liability that currently is based upon no training whatsoever in the single incident context, then the court would, if it reached beyond the grasp of the cases right now, to go to the question of supervision, it should not go any further than the no supervision at all, and then the court would affirm summary judgment because, again, the undisputed record shows that supervision. The Supreme Court's opinion in Board of Commissioners of Bryan County versus Brown made this very clear and specifically pointed out that where municipal liability rests on a single decision that itself doesn't represent a violation of federal law and doesn't direct a violation of the federal law. The Supreme Court differentiated, by the way, and the reason that this court should not venture into the area of a failure of supervision is that in Board of Commissioners of Bryan County versus Brown, the Supreme Court made clear that there's a distinction between the failure to supervise and the failure to train. They differentiated the Supreme Court's holding in the City of Canton versus Harris and rejected the adoption of a similar argument as it relates to supervision. Counsel, can I ask you, I want to make sure I, since I wasn't here for the last argument, I want to make sure I understand what claims were in the case and which ones have, and how they have fallen out. As I'm thinking of City of Canton, thinking of different ways that you would sue, in particular, the Chief of Police in a set of circumstances like this, I could imagine two different claims. One, you could sue the Chief of Police in his role as a policymaker and that is an official capacity suit that really runs against the City of Madisonville. I understand that's why we're here today. But I could also understand that you could sue the Chief of Police in his personal capacity for his personal failures to supervise, his personal failures to train, his personal failures to intervene, his personal knowledge about what was going on with the CI program, his personal relationship with the officers involved. Obviously, different suits. So were the personal capacity suits against the Chiefs part of this case at some point and they've fallen away? I was here and I can't answer that question. I don't remember, but I think the answer is no. Okay, so they've never been sued in their personal capacities. And I've been with this case from its outset, Judge, and I should know the answer to that question. I just don't recall. Your Honor is 100% correct, obviously, in the differentiation of the two, except that, as Your Honor knows, the court generally regards supervisory liability claims similar to the that was presented to the district court on remand from this court was the sole question of whether the city of Madisonville could be liable based upon the allegation that the Chief May was the city policymaker. Fair. So two follow-up questions really just about sort of where things stand. Is this the last piece of this case? Is there anything left in the district court or this is it? Yes, it is, and I certainly hope it. I certainly hope my friend agrees, but it is, yes, Judge. And then my last question is what happened to the first page of Judge Heenan's opinion identifies Justin Barham as the the other officer who was arrested in this horrible incident. Do you know what happened to Mr. Officer Barham or former Officer Barham, I guess? I knew it sometime, Judge, but I apologize I don't recall today. But as far as you know, the only person who suffered criminal sanction for this was was Jeffrey. I feel like, again, this is I'm just reaching, Judge, but I feel like Barham may have been charged with something, but I, again, Mr. Watts may be in a better position to answer that question. The last thing I do want to point out is that in this in this particular instance, in addition to the argument of a single incident exception, again, which I think the Supreme Court has foreclosed in Board of Commissioners versus Bryan County, which is cited at page 34 of the brief, and I do want to differentiate for a moment appellant's citation to the case on remand, which is which was Brown versus Bryan County. The difference there is that we were the court was dealing with a sheriff. There's absolutely no question that a sheriff is the final policymaker for law enforcement in their county because that's the law. Again, the reference is not does the sheriff, as appellant would argue here, do a lot of the things that run the sheriff's department. Maybe, maybe not, but it doesn't matter because the law fixes that authority and that responsibility upon the elected sheriff. That is not the case here, and so references to that case are really not helpful. The last thing I want to mention is that the ratification theory, which is the second theory of liability against the city here, fails as well. Under Proprotnick and this court's interpreted cases, the evidence must be both that the supervisor approved a subordinates decision and the reason therefore, and so that's where this fails, and of course it failed because Chief wasn't Chief May wasn't the policymaker, but it also fails because there's no evidence in the record that Chief May either approved of Covington's conduct or that he approved of the reasons for it. In fact, the evidence shows that as soon as Chief May became aware of the fact that there was evidence suggesting Sergeant Covington had violated the law, he terminated Sergeant Covington immediately for that very reason. Thank you for your time. Thank you, counsel. Mr. Watts, you have five minutes of rebuttal time. There was no lawsuit. Okay, wait, why don't you come on up here. There was no lawsuit against the Chiefs, and the reason for that was a deposition testimony, and that we anticipated and the policies that we knew. The second of all, Barham was convicted of crime and forfeited his T. Cole license, forfeited the ability, and paid a fine, a heavy fine. They all got off pretty light, frankly, but that was in Bryan, and that was not very far away. The second thing is there's no difference. Don't get misled by this business about Brown deals with the sheriff, and sheriffs are different as policy makers. Policy makers are not, they could be policy makers by virtue of state law, or they could be policy makers by virtue of local policy, or they could be policy makers by virtue of local facts. In this particular case, I think it's important also, something else that came up, this court didn't send it back down to decide whether or not, to re-decide whether or not there was a policy maker, Chief May was a policy maker, or whether Chief Clendenin was a policy maker. That's not why this court sent it down. Judge Englehart was on this panel when it first, and was very active in his questions then as he is today, but the point was that it went back on something else totally different. It went back because there was a decision when counsel says that Judge Harmon didn't make a ruling about policy makers, wrong. She pointed out, and I pointed out in my 28J letter, the specific portion of her decision where she says that the argument that the Chiefs were not policy makers has been raised and is denied. Denied. I mean that's pretty darn clear. Counsel, suppose I agree, can you hear me okay? Can you hear me okay? I hear you perfectly. Great. I've got my hearing aids and the help. Suppose I agree with you that the Chiefs are policy makers, that the decisions that they're making when they promulgate this manual, that they are speaking for the city of Madisonville, they're responsible for every jot and tittle in the manual, they're responsible for the org chart, everything we went through in your opening. Would the city of Madisonville therefore be responsible for every constitutional tort effectuated by a police officer in the chain of command? Well, you have to have some deliberate indifference. You have to have some of the other things. You have to have some of the other things. You have to have some of the other things. If the city of Madisonville's policy maker, the Chief, were to ratify, remember this, Chief May had two policies. This is a question that Judge Engelhardt asked the first time, several years ago. What are the policies? The policies are number one, I don't believe crackheads against my officers. That's a testimony that he gave. Number two, I won't do anything because I don't believe crackheads against officers. He didn't supervise and didn't investigate. Now, is the city of Madisonville liable? If the shoe fits, then they must wear it, or they must get in there and do a business-like review of the policies and say that certain things have to be done. I mean, we can't give them a free pass on being governance of the city of Madisonville simply because they are elected to that position. They have the responsibility. Are they liable for the Chief's authorizing or participating or saying, I'm not going to investigate or I'm not going to supervise? Well, that's sort of what the issue was with Brown, in a way. The question came up in the opinion. Should the good citizens of the county be responsible for the idiocy, if you will, of the sheriff in hiring his nephew to be a deputy who can't drive a car and can't carry a gun but can beat the way out of a motorist passenger? Let me, one other thing I want to say. The point about whether or not, as soon as the Chief found out he terminated Covington, that's false. The record shows that's false. May says that it's false. He had a hint. Your time is up, Mr. Watts, if you want to go finish your sentence. Go ahead and finish your sentence. When he had a hint, as he said he did, that the guy was being indicted, the very same day he allowed him to resign and he gave him an honorable discharge. Excuse me, terminated? Not on this watch, he wasn't. All right. Thank you, Mr. Watts. We have your arguments. We appreciate your briefing. The case will be considered submitted at this point. Counsel, for the next case,